SIDENSE CORPORATION, MR. COOK. Morning. Roger Cook for SIDENSE. SIDENSE is appealing denial of Section 285 attorney fees following a successful defense of the patent infringement case. As this panel knows, the critical issue in the case was that there were two, the claim terms required a first and second dope semiconductor region. SIDENSE omitted one of those and the question was whether or not there was infringement by equivalence. That's an interesting point, Mr. Cook. An equivalence claim is of course a legitimate claim, but when one's evaluating bad faith, an equivalence claim is an uphill battle and my took five years of checking with law firms before you put together what you thought was a reasonable claim and so why couldn't this have been evidence of bad faith? Well, I'm representing the prevailing party. That might be a question for, I mean we say it is evidence of bad faith, no question about it. The critical fact was at the very beginning of the lawsuit, KILIPAS formed a blue-ribbon investigation team of their CEO Bernie Aronson, their CTO Harry Luan, and their patent attorney Chun-Ing. They interviewed the inventor. They had seen a patent, published patent application of SIDENSE. It had two embodiments in it. One of them had two diffusions and one had a single diffusion. When they interviewed the inventor, he said, well, I built and tested a single diffusion version and I found that that wasn't any good. It was too large. Are you bound by Brooks Furniture? Well, I would argue we are not. How would you argue that? Because Brooks Furniture was a decision of a panel that was inconsistent with the prior version, prior cases. LTCH? You're talking about LTCH and others? No, the cases are listed on page 45 of our opening brief. They are cases that said that in order to get attorney fees under 285, you looked at all the equities. So is your primary argument that the trial court erred and abused its discretion in denying your 285 fees under either Brooks Furniture or is your primary argument that we really need to have a more flexible view under 285 and this court ought to rethink whether Brooks Furniture ought to be the standard? Both. Those are alternate arguments. The court under Brooks Furniture, we argue that SciDents have satisfied Brooks Furniture, but if not, we believe that the case of that standard needs to be more flexible and it should. And LTCH is the case that set forth the totality of circumstances case test that you are I didn't think that was among the cases that we cited that I may be wrong. Well couldn't a Brooks Furniture court have relied on the intervening PRE? I mean I know you argue that PRE shouldn't have been adapted for use in under 285, but at least there is the argument that there was an intervening Supreme Court case law. Well, yes there was intervening law, but that did not require, that was a whole different issue. It did not require adoption of, don't forget the PRE was a question of what test do you apply before you can find that a patent infringement suit was sham litigation for persons of antitrust law. That's a whole new ball of wax. We're only talking about section 285 attorney fees. It's a simple question of whether it would be unjust to deny attorney fees. It's within the framework of the patent statute. Antitrust law is a whole different issue. Is the difference just bad faith? Is that what the difference is between the LTCH standard, the prior standard of totality of evidence standard and Brooks Furniture? That certainly is a difference. The need not be as rigorous, but it still requires a baselessness evaluation in our view. Now, an exceptional case, will that, where does bad faith come into that? Why is that part of the requirement do you think? I know you don't think, but I'm curious on how it can be part of a statute that doesn't mention bad faith. Well, apparently the court was influencing, Judge Lowry, Lurie was a member of the panel, but I'm speculating that they were heavily influenced by the PRE case. Which was an antitrust case, not an exceptional circumstances case. I'm trying to understand what standard you're arguing for. Are you saying there should be some kind of a sliding scale so that even if something's not objectively baseless, if it's a weak merits case and you've got some bad faith that somehow it could still be an exceptional case? If it's a case that no rational person would have relied upon and expected success, that would be the standard that we would argue. Well, why wouldn't that make it objectively baseless under PRE in any event? It's different verbiage. I think it's easier to explain my version of it and the Seagate version as well than the Supreme Court objective basis. In terms of the actual results though in those cases, those cases that you cite, LTCH and others, in those cases though didn't the courts actually, even though they used sort of broader totality of the circumstances language, didn't they come right out and say that they were completely meritless and frivolous cases? I would agree with that, yes. Okay. As to your first argument, as I understand in your response to Judge Lurie, is that you're saying that we should look behind any effort that was made to contact counsel or to have conversations with counsel and just like you would in a willfulness, we're supposed to look at those underlying opinions and determine whether those had any merit? I think those underlying opinions would have had to be reasonably relied upon. I don't think it's sufficient that they just existed. I think the law should be the plaintiffs and defendants, both patent owners and alleged infringers. So in order for this advice of counsel defense to have been applied by the district court, she would have had to find that it was reasonably relied on and they could not have reasonably relied upon it because of this substantial size difference. The opinion didn't take into account the substantial size difference, something that Killepass well knew, the blue ribbon panel. Why should the standard be the same for patentees and defendants? Because the conduct is different. A patentee is enforcing a patent, which does or does not reasonably believe is valid and infringed. And the accused is being judged by its conduct as an infringer. So they're different parties in different positions with different types of conduct. So one wouldn't expect them to be judged by precisely the same standards. But I think their position in court can be judged by the same standards, whether it was well-framed or whether they had no reasonable expectation of success. I just don't see how the mere existence of opinions, whether they were good or bad or indifferent, should control. And what's more, in this case the opinions themselves were omitted any reference of the substantial size difference and we find that to be a critical difference here. It's inconceivable that a firm like Morris and Forrester, if they had known of the size difference, wouldn't not have mentioned it. They had a detailed infringement opinion, detailed discussion of infringement by equivalence, no mention of size difference. They did correctly recite the rule that infringement by equivalence requires an insubstantial difference. They addressed negative facts, they addressed the present reference STI and the patent specification. They didn't mention this. That's a telling omission. It's also inconceivable that Killepass would not have told them, or would have negligently failed to tell them, that they couldn't have forgotten about it. This is a memorable fact. It said that it was the first thing they learned, which was that it's surprising that a single diffusion memory cell was larger than a multiple diffusion memory cell. Surprising. It was also something that they could use in marketing. It was the fact that they could say, we invented it first. We were there first, and theirs is larger than ours. I mean, these are important things. They could not have, in good faith, omitted, simply forgotten to mention that. Can you respond just quickly to a few of the facts in this case? The Morris and Forrester firm says there's a likelihood of doctrine of equivalence. There's an engineer, Luan or something, who says the an amount of evidence here saying that there's likely infringement. Well, as I said, Morris and Forrester, they didn't have the information. They couldn't have had the information, and if they did and left it out, then I would say it was a cosmetic, specious opinion that was an exception in Brooks. They spent 44 hours on it. That's a week. Yeah, I don't think that, I don't think Morris and Forrester left it out. I think Kilopass didn't tell them. I think they didn't tell them because they didn't think they would take the case if they told them. I think they had already consulted with Chun Ng, the patent attorney. He was a patent attorney. He knew that an insubstantial difference would defeat equivalence. He never told them that there was infringement by equivalence. The only favorable opinion he gave them was when he believed that there might be two diffusions. Once he found that there was only one, he never gave any favorable advice from that point on, and in fact, he said he didn't, he thought they had designed the product to avoid infringement or at least make our case tougher. One of the problems I have with your overall picture here is that you're arguing that the district court should have very broad discretion in a totality of the circumstances to award 285 fees, but when I look at the discretion that she seemed to exercise, and admittedly the opinion was very short, but it seemed to be that the district court felt that a pox on both your houses. I mean, she seemed to say that both sides had engaged in litigation misconduct, and that as a result, it sort of washed each other out, and so that nobody was entitled to sanctions or fees because of that. Isn't that exactly the kind of flexibility you want us to give the district court? Well, there were two lawsuits, and there were competing business tort claims that were like the tail that wagged the dog, and she didn't like the way that either side handled that particular case, but the patent infringement case was 90% of the case. So are you arguing that we have to excise out any conduct that related to those aspects of the case for purposes of assessing 285? She never said there was any misconduct or anything approaching that in the patent infringement case as far as... Right, but she did say it. It says, as far as the business tort claims go, both sides in this action were sufficiently disingenuous and obdurate that the court was required to extend considerable judicial preparation for a jury trial that both sides knew would never occur. She described the overall litigation as discouraging. So are you saying that that might be relevant to excise that out of the analysis under 285? I certainly believe that you should. That was with... after summary judgment was granted on the patent infringement claims, then the business torts were left, and it was... they were heading for trial, and it was a very discreet part of the case, and there was absolutely no concerns prior to that time. Their last month upset the judge. Thank you. Mr. Cook, we'll restore your rebuttal time, and would you give Miss Dury an extra four minutes if she needs to use it? That'll keep things about even. Thank you, Your Honor. The crux of the question here is whether Kelo Pass reasonably relied on advice that it received from Morrison and Forster, among others, in determining that it had a reasonable case under the doctrine of equivalence. The only substantive argument that has been presented to the contrary is that the Morrison and Forster opinion did not explicitly describe the size difference between the accused product and the product that was described in the patent specification. Why shouldn't we just remand, though, at least for purposes of telling the district court to separate out her problems with the business tort conduct from the actual 285 analysis? It is clear, Your Honor, that the court was distressed by the party's conduct with respect to business torts, but I don't think the She indicated that this was a case that had been over-litigated. She referred to the docket in its entirety in explaining her assessment that this was not a case in which fees or sanctions were appropriate, as against either side. What about your CEO bragging that he will take out Sydence, and then there's a something that discusses gamesmanship, and some statements that are kind of on the borderline. Sydence and Kilopass are competitors in this area. He was brought in to turn the company around. There is a presentation in which he notes the patents appear to be strong. He puts up a little PowerPoint that says, Look out, Sydence, here we come. Well, it says two things, Your Honor. It says the patents appear to be strong in his analysis, and it says that in order for Kilopass to have a viable business, it's going to need to have this market space to itself, and it has patents covering that. And the assertion of patents to District Court did not decide the issue of objective baselessness. Why shouldn't we send it back to have her deal with objective baselessness so there'll be a complete record, and after all, as we know, the cases from our court might go further. Why shouldn't we send it back? Respectfully, Your Honor, we don't believe this is a case where it is necessary to obtain further guidance from the District Court as to what she believes the appropriate remedy here to be. You're not saying we can decide objective baselessness? I think the court could make that determination. I don't think the court needs to make that determination. I think the record amply supports the District Court's determination that this was not a case. And I want to know... Ms. Dury, kind of following on this line, if we follow our law, which requires us, of course, to apply the earliest determination of what our law of 285 is, there wouldn't be any subjective objective dichotomy in 285, would there? We'd be applying LTEC and a line of five or six other cases that don't make that distinction. I understand Your Honor's observation. And I would note first, I don't think there is any reason to believe the result in this case would have been any different under any standard that reasonably might be applied. Well, but then we'd have to find out if that's the case. We'd need to send it back and say, please apply the correct law this time. Well, I would say, Your Honor, nothing about Judge Ilsen's opinion suggests that this was a case in which she felt constrained by the applicable legal standard to reach the result that she did. And again, as Judge O'Malley noted, to the contrary, this does appear to be a pox on both your houses case. And second, I would suggest even under a totality of the circumstances test, there's ample reason in this record to believe that Kelo Pass acted reasonably in making the determination that this was a case that could be brought. The record in this case is unusual because it results from a finding of privilege waiver with respect to all of the various legal analysis that was conducted. But part of the problem is you're asking us to peruse the record and figure that out. Under 285, this is initially an inquiry that lies with the district court. And I have the greatest respect for Judge Ilsen, but the entirety of her opinion was one paragraph. One paragraph. And she doesn't discuss at all any of the things that we're talking about here. She simply just says there's not enough to show that they acted in bad faith. There's no objective analysis. There's no comparison of how that might be indicative of bad faith, that if it is objectively meritless, then how that weighs in the subjective component, none of that's in there. I agree, Your Honor. It's a very short opinion. But she does reference the fact that Kelo Pass obtained advice from two different law firms prior to making the decision to institute this action. And the advice that the company received from Morrison and Forster is particularly significant. Sidens' only argument to undermine the Morrison and Forster opinion is that they speculate that Morrison had not been told that there was a difference in cell size. Two observations about that. First, nothing in the patent suggests or ties cell size to anything having to do with the use of a doped semiconductor region. It's true that the patent provided for a smaller cell size. It did so because it used only two lines and was therefore an improvement over the three-line prior art. Why did it take five years to generate a basis for filing an equivalence claim? Your Honor, I would not suggest that it took five years to generate the basis. I would suggest they spent a lot of time investigating whether they did have a basis. From the beginning or from early on, Kelo Pass appreciated that Sidens had tried to design around its patents. And it's undisputed that Sidens saw the Kelo Pass patents and endeavored to design around them. And the question was whether that effort had been successful. They identified early on the substitution of an STI region for a doped semiconductor region. And the question was whether that was equivalent. I would not say, Your Honor, they spent five years trying to come up with a theory. I would say they spent a long time being sure that that was a viable theory. And part of that work was the engineer's analysis. Part of that work was getting a Sidens chip. The way to find out is filing a lawsuit promptly. Well, I would suggest, Your Honor, that the goal of the system is not simply to file a lawsuit promptly without regard to its merits, but instead to be sure that that case has merit from the inception. And that's what they did. They reverse engineered the chip to be sure that their assumptions about what Sidens had done were correct. And they engaged Morrison and Forrester to give them an opinion. Now, I want to note one thing about the Morrison and Forrester opinion that's important. Sidens speculates that Kelo Pass withheld information from Morrison and Forrester so that the opinion would be a sham. That makes no sense. This was not an opinion that was intended to be disclosed. This opinion only came to light because there was an inadvertent production and then a finding of privilege waiver. So it makes no sense that they would have retained Morrison and Forrester and spent money on that analysis unless they were in good faith intending to rely on it. Well, why wouldn't the trial court then have really had to conduct a hearing in this manner? I mean, you're asking us, your briefs essentially ask us to make credibility findings about what Kelo Pass really intended or what they disclosed or didn't disclose. And yet, there was no hearing. There was no trier of fact making those credibility findings. And I'm not, your honor, asking this court to make credibility findings. I'm asking this court to defer to the district court's judgment with respect to what was appropriate in this case. The district court clearly concluded she didn't need to have a hearing in order to decide these issues. The parties had been litigating this case in front of her for a long time. She had presided over claim construction and over multiple, multiple rounds of motions. And it had an ability to evaluate the merits of the case as well as evaluate this purported distinction that Zidins was drawing with respect to cell size, which again had nothing to do with the claims. Why did you tell MOFO to stop after eight days? So the original estimate from MOFO was that it would take them 30 to 35 hours and it would cost $20,000 to do this work. They ultimately spent considerably more hours than that and proffered a bill that was for $30,000 in excess of the estimate. Nothing suggests their analysis at that point in time was incomplete. They provided claim charts. They didn't say we haven't yet completed our analysis. Well, wouldn't that be indicative of the fact that they weren't able to find anything upon which you could rely? No, Your Honor. The claim charts provide a detailed assessment of the doctrine of equivalence and find that there was a reasonable basis for concluding that the use of STI served as a channel stop and that that was the function of the doped semiconductor region. That doctrine of equivalence analysis is set forth in the claim charts. It's detailed. It's clear. There are no caveats. Well, didn't they say that, in terms of a caveat, didn't they say that this is a preliminary view? Well, they said that the claim charts were styled preliminary. That doesn't mean that they were preliminary in the sense that they couldn't be relied on. They were not necessarily complete such that you would serve them in the litigation. Morrison and Forrester had not been retained as litigation counsel, but there's nothing that suggests that the analysis that was done was incomplete with respect to the client's ability to rely on it for the purpose for which it was being provided, which was to make a decision about whether there was a basis for bringing suit. We haven't discussed the elephant in the room. The Supreme Court has granted certain octane. How does that affect us? Your Honor, I suggest the answer is that it does not. There's nothing here to suggest that the district court would have reached a different result under a different legal standard. This is not a case where... That brings us back to what Judge O'Malley said. We have no basis on which to make that conclusion. We have one paragraph. If there is a question as to what standard's been applied and whether that standard is even the law, don't we need to go back? Not unless it is the court's judgment that in every Section 285 case must be held in abeyance pending Supreme Court review. And I would suggest that's not an efficient result. What if we are of the conclusion that the proper standard is the first one, LTCH, etc., and we're not confident that's been applied? I would suggest the factual record in this case would amply support the proposition that fees would not be warranted under either standard. This was really not a close case, I would suggest, with respect to a request for fees, given precisely the amount of time that Kelo Pass spent determining whether a lawsuit was viable and the fact that it received outside legal advice and did its own analysis. This is very different from the kinds of cases in which fees previously had been awarded where there really was not the demonstration of a serious effort to determine whether this was, in fact, a meritorious position. And I would suggest the question whether STI was, in fact, equivalent to adult semiconductor region was, at worst for my client, a close question. The district court ultimately concluded that it was not, in part because it would result in a larger cell size, although nothing in the patent, as I said, tied the use of adult semiconductor region versus STI specifically to the benefit of the invention, which was a smaller size for completely different reasons, having to do with the two lines versus three. I think arguing that the length of time actually works in your favor as showing the care with which the issue was investigated rather than indicating the difficulty of putting together a claim. That's absolutely right. I mean, the chronology here is that at the beginning when this issue surfaces, concerns or questions are raised about what the implication of this is and whether there is a doctrine of equivalence case. And I would note the prosecution attorney does not say there is no infringement. He says, I don't think there is literal infringement. And so the question immediately is presented as to whether there is a good faith basis for a doctrine of equivalence case. There's an enormous amount of work that goes into that inquiry. They receive an opinion of counsel that on its face says there is a basis for it. The only attack on that opinion of counsel is speculation that information was withheld. But it makes no sense that you would withhold information from counsel you are paying to render an opinion that you intend to keep privileged and not disclose. And the more logical implication is that no one thought that cell size made any difference to the analysis, which makes sense because the function of the DOPE semiconductor region was not to provide for a smaller cell size. It was to delineate the channel. You asserted literal infringement, right? There was an assertion of literal infringement. And I think had the case only proceeded on the basis of literal infringement. Was that withdrawn? I believe your honor that at a minimum the ultimate emphasis was on the doctrine of equivalence case. I don't remember precisely what happened to the literal infringement assertion after claim construction. I do know that there's evidence in the record. And you've also been told by Perkins Cooey that there was no literal infringement, right? Well, Perkins Cooey had said they thought there would not be, originally said they thought there would not be literal infringement. You asserted it anyway. There was then an argument that was put forward that there would be literal infringement because the deposition would create a second DOPE region literally. And there was an assertion in the record. I think there is no question and the Morrison and Forster opinion says we think there is at least a case under the doctrine of equivalence. But they never said literal. You did assert a claim that two different law firms said you shouldn't assert. Well, I would suggest, your honor, I don't think the two different law firms said you should not assert it. I don't think Morrison and Forster addressed the question. Perkins Cooey came up with a theory for literal infringement. Now, I think if that had been the only basis for the claim, we would be having a very different conversation. But there's no suggestion that the assertion of literal infringement in addition to the doctrine of equivalence case made any difference in terms of the conduct of the litigation. But how can that be true? It's going to multiply their discovery obligations and it's just going to multiply the expense that they have to go to. If you have to defend two, three, four, five claims, it's different than one, isn't it? It was the same claim, your honor. I mean, I think if additional claims that raised genuinely different issues had been in dispute, I would understand the basis for that concern. But here, there is a claim that is being asserted. It is being asserted to cover the same instrumentality. The question is whether the device that has one doped semiconductor region and one STI region infringes this claim. There's no reason to think that coming forward with a literal infringement argument in addition to a doctrine of equivalence argument is going to affect the scope of discovery at all. I think, isn't Perkins telling you that you need to go to re-exam so you can make a literal? Isn't that multiplying the potential for proceedings and expense? Well, Perkins originally said if we want to make out a literal infringement case, we would first need to go through a re-issue proceeding and get claims issued. That's not what they decided to do. They decided to proceed on a doctrine of equivalence theory first and foremost in lieu of going back to the patent office. I would suggest, Your Honor, that was a reasonable decision based on the strength of that doctrine of equivalence case. I don't think there is support in the case law for the proposition that adding in a literal infringement claim to, in and of itself, would suffice for a conclusion that the claim was brought in bad faith. I mean, alone, that would be a Rule 11 violation, would it not? And Mark Tech says that Rule 11 violations can be a basis for a 285. I mean, the problem you have with that is you're saying, all right, we can shop as much as we want until we finally get an opinion that says, okay, there's some viable theory. And then we can assert any theory we want, even ones we know are not viable. It does change the whole status. When you're the district court judge and you get a case that says there's literal infringement and DOE, that's very different than a case that when it first walks in you say, you know, we admit there's no literal infringement. This is a pure DOE case and that's the only thing we can proceed upon. The trial court approaches the case very differently. So I do not agree that it would be a Rule 11 violation to have brought the literal infringement case because, as I said, they did have a theory for literal infringement with respect to the deposition. I agree that they did not have the benefit of an opinion from Morrison and Forster supporting that theory, which is why I said, had that been the only issue that were presented, I think we would be having a different conversation. But where you are bringing a DOE case, and this case was litigated first and foremost as a doctrine of equivalence case. That was the issue the expert reports are focused on. That's the issue that was ultimately presented at summary judgment. There's no showing that having for a period of time asserted literal infringement to actually made any difference in the conduct of this litigation. And I would say, yes, a Rule 11, if this truly were a Rule 11 violation, a Rule 11 violation makes a difference, but where you're asserting a claim where it's a Rule 11 violation to pursue that claim. I think that's very different from saying that you're going to parse every single assertion that is made and start awarding fees in either direction based on whether you win or lose on those particular individuals. Would that at least be evidence that was indicative of bad faith that the trial court should have taken into consideration? The trial court presided over this case and was certainly aware of the parties allegations and what happened to them. So there's no reason to think the trial court did not take that into consideration. What I think the trial court ultimately concluded is that the evidence in this case showed that this is a case where the client spent a lot of time, looked hard at the question, interrogated it from all angles, and got outside legal advice confirming that it had a basis to file suit. And that in the district court's discretion, that made this a case in which fees were not warranted. And that's a judgment to which I think this court should appropriately defer, as I said, under any rational legal standard that might be applied in this case where you have well-respected outside opinion counsel. You do a teardown of the actual product to figure out how it works. Your own CTO provides engineering advice and also comes up with claim charts. And there's a robust sort of discussion back and forth about the merits of the case. This is not a situation where there's a record that simply says, we're going to file a lawsuit without interrogating the merits. And I think that is the situation that 285 was designed to address where there is not care and thought that goes into the decision to file suit and the decision is made without regard to the merits. Here, I don't think the court could conclude under any standard that this is a case where there was not a careful and thoughtful evaluation of the merits before filing suit. Thank you, Ms. Drury. Thank you. Mr. Cook. Mr. Cook, as a matter of kind of policy, wouldn't we prefer the broader LTCH exceptional circumstances, the court's original doctrine, because it gives the district judge the broadest latitude to decide whether fees are warranted? And they're the ones who sit through the whole trial and know whether literal infringement was justified or whatever else we've been talking about here. I would agree with you on that with one caveat, and that is that on the objective baselessness standard itself, I think this court should maintain some right of review on that. I think that's a province of this court, perhaps more so than district courts. But other than that, I would agree with you. Well, at least under our current case law, that's what we say, is that objective baselessness is reviewed. That's correct. But the court didn't make any objective baselessness. That's correct. It went off on the bad faith. But if it is a two-pronged analysis, I mean, if you really have to have both, then why couldn't the court have simply looked at the second one and said, regardless of what the first one is, I don't find bad faith? Yes, certainly. I mean, if it's a two-pronged approach, then obviously you find one prong is missing, then that would be a correct decision. I don't have any disagreement with that. And you don't think that one prong is informative of the other? Well, you make a good point. Yes, I actually do, though. I think that if it's objectively baseless, I think that does inform whether or not the claim is in bad faith. I certainly agree with that, yes. And you think the district court should look, assuming there are two prongs, look at both so the case can be reviewed in its totality? I think it should have, yes, for sure. But where does the discretion lie? With them or with us? Where should it lie? I'm not sure. Don't you think you ought to think that through? Well, yes. May I make a... I think the discretion... I'm still hung up on the fact that I believe that this court should maintain some control over objective baselessness. I think that's an important decision, something this court... well within this court's expertise. It's beyond the expertise of district courts in many instances. The district court sits there and hears the case. You think we're better equipped to decide what's baseless? You're making a good point, Your Honor. I have, along with my colleague, been a district judge in many patent cases. I can tell you I know more about the cases I try than those I hear on appeal in every instance. Let me use an example to explain what I think my view on this is. In this particular case, the objective baselessness decision, if you look at the Morrison-Forrester channel stop theory, that presided over the infringement opinion throughout almost the entire case. If you look at that decision, at that theory, it's a theory of lawyers, and lawyers always make up theories, but there was no factual support whatsoever. There was no mention of channel stop in the patent specification. No technical expert supported that theory. Professor Neekirk, Kilopass' technical expert, actually refused to support it and eventually repudiated it in his deposition because he said whether or not electrical current flows in that region is irrelevant to the finding. Thank you, Mr. Cook. I think your time has expired. Thank you, Your Honors.